UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                    Criminal No. 11-CR-0089 (RHK/LIB)


        v.                                    **REPORT & RECOMMENDATION**

JERILEE JANE HEAD,

              Defendant.


        This matter came before the undersigned United States Magistrate Judge pursuant to a

general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636(b)(1)(B),

upon the Defendant's Motion to Suppress.   A hearing was held on April 12, 2011, at which time

the Defendant appeared personally, and by her attorney, Richard W. Curott, and the Government

appeared by Clifford B. Wardlaw, Assistant United States Attorney.  Special Agent Robert

Mertz ("SA Mertz") and Criminal Investigator Geoffrey Pierre ("CI Pierre") (collectively

"officers") testified at the hearing.  For reasons which follow, the Court recommends that the

Motion be DENIED.

## I.      BACKGROUND

        On the evening of January 15, 2011, SA Mertz and CI Pierre were parked in a parking lot

of the Red Lake Fisheries Building in Redby, Minnesota.  On that day, the officers were

searching for Cruze Anthony White pursuant to an arrest warrant for murder.  White and Donald

Leigh Clark, Jr., whom the officers were also seeking pursuant to an arrest warrant, had been

fugitives since November 3, 2010.  The officers earlier received reports that White was riding

around in a vehicle in the area around Redby.  While parked, the officers saw a white Pontiac

Grand Prix matching the description given to them regarding the vehicle allegedly containing

1

White.  The officers knew from earlier investigations into White's whereabouts that this car belonged to the Defendant, whose boyfriend was Donald Leigh Clark, Jr., the other fugitive. Further, the officers had received reports that Clark was staying with the Defendant.

After seeing the vehicle, the officers left the fisheries parking lot and began to follow the vehicle.  While behind the vehicle, the officers were unable to determine definitely whether it belonged to the Defendant because the license plate was obstructed by snow.  Red Lake tribal law requires that vehicles  be registered and prohibits unsafe vehicle equipment.  Due to snow cover, CI Pierre could not tell whether there was a valid license plate on the vehicle, and he therefore initiated a traffic stop because the license plate was obstructed.  After CI Pierre activated his lights to initiate a traffic stop, the vehicle sped up and tried to avoid being stopped. The officers followed the vehicle until it stopped at a residence which, from prior investigatory work, the officers knew belonged to Donald Leigh Clark, Sr., the father of one of the fugitive suspects in the murder investigation.  The Defendant stepped out of the car.  At the same time, CI Pierre exited his vehicle.   CI Pierre instructed the Defendant to stop, which she did briefly before continuing to proceed to the door of the residence.  CI Pierre followed her and grabbed her wrist so she could not enter the residence.  CI Pierre then led the Defendant back to SA Mertz's vehicle.  Sometime during this period, CI Pierre handcuffed the Defendant.  However, one of the officers removed the handcuffs shortly thereafter.

The Defendant was directed into the passenger seat of SA Mertz's vehicle.  At this point, SA Mertz told the Defendant that they were looking for White and Clark and asked the Defendant if she knew where they were.  The Defendant responded by identifying a residence where she claimed White was located, and offered to take the officers to the residence.  With the

Defendant in his vehicle, SA Mertz followed her verbal directions to where she alleged White was located.  CI Pierre followed in his vehicle.

On the way to investigate the location where the Defendant alleged White was hiding, CI Pierre became suspicious about the Defendant's sudden cooperation in the investigation because the officers had previously interacted with the Defendant before concerning the fugitives' whereabouts without receiving any cooperative information.  CI Pierre called SA Mertz to recommend that they turn back.  CI Pierre returned to the Clark residence where he used his flashlight to look through the windows into the Defendant's vehicle.  CI Pierre viewed a person wrapped in a blanket in the backseat of the vehicle.  Thereafter, CI Pierre used the keys previously given to him by the Defendant to open the door to the car.[1]  After opening the door, CI Pierre identified the fugitive, Donald Leigh Clark, Jr., as the person in the vehicle.

Pursuant to these events, the Government indicted the Defendant, who is an Indian, with one count of acting as an Accessory After the Fact.  According to the Indictment, the Defendant knew that her boyfriend, Donald Leigh Clark, Jr., committed an offense against the United States[2] and that he received comfort and assistance from her in order to hinder and prevent his apprehension, trial and punishment in violation of 18 U.S.C. § 3.  Presently before the Court is the Defendant's motion to suppress based on the alleged unconstitutionality of the traffic stop of the Defendant, the Defendant's involuntary statements to the officers, and the officers' illegal search of the Defendant's vehicle.  The Court considers each argument in turn below.

## II.     CONSTITUTIONALITY OF THE TRAFFIC STOP

---

[1] Earlier, when CI Pierre first made contact with the Defendant at the Clark residence, he asked the Defendant if there was anyone in her car.  She responded that no one was in the car and that the officers could look inside it if they wanted.  After opening the door, CI Pierre found Donald Leigh Clark, Jr. in the vehicle.  CI Pierre further testified that he would have looked in the vehicle before turning the keys over to Donald Leigh Clark, Sr.'s wife as the Defendant had requested.
[2] The Indictment asserts that Donald Leigh Clark, Jr. committed murder in the first degree, murder in the second degree, assault with intent to commit murder and assault with a dangerous weapon.

A.      **Standard of Review**

The Fourth Amendment provides that "the right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." United States Constitution, Amendment IV.  "A traffic stop constitutes a 'seizure' within the meaning of the Fourth Amendment." United States v. Martinez, 358 F.3d 1005, 1009 (8th Cir. 2004) (citing Delaware v. Prouse, 440 U.S. 648, 653 (1979)).  The principles of Terry v. Ohio, 392 U.S. 1 (1968), govern traffic stops.  United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001). "Generally, a traffic stop must be supported by at least a reasonable, articulable suspicion that criminal activity has occurred or is occurring." United States v. Fuse, 391 F.3d 924, 927 (8th Cir. 2004); see also United States v. Cortez, 449 U.S. 411, 417 (1981)("An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity").

The Eighth Circuit has noted that "it is well established that a traffic violation-however minor-creates cause to stop the driver of a vehicle." United States v. Barry, 98 F.3d 373, 376 (8th Cir. 1996).  This is true even if a valid traffic stop is a "pretext for other investigation." United States v. Linkous, 285 F.3d 716, 719 (8th Cir. 2002).  Courts have refused to create a "finely-tuned standard" or "a neat set of legal rules" as to what constitutes reasonable, articulable suspicion. Ornelas v. United States, 517 U.S. 690, 696, 703 (1996).  Therefore, the standard remains an "elusive concept." Cortez, 449 U.S. at 417. As such, reasonable suspicion justifying a traffic stop may be found when the "totality of the circumstances" demonstrate that the detaining officer had a "particularized and objective basis for suspecting legal wrongdoing." United States v. Jones, 606 F.3d 964, 966 (8th Cir. 2010).  "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the

cumulative information available to them that might well elude an untrained person." United

States v. Stewart, 632 F.3d 453, 457 (8th Cir. 2011) (quoting Cortez, 449 U.S. at 418).

**B.     Discussion**

In the instant case, CI Pierre testified that he attempted to pull the Defendant over

because snow obstructed her license plate. In cases similar to the present case, numerous courts

have found that the inability of an officer to view a license plate or temporary registration

constitutes reasonable suspicion for a traffic stop when such an action violates state law.  United

States v. Bueno, 443 F.3d 1017, 1024-25 (8th Cir. 2006) (traffic stop was supported by

reasonable suspicion where the stopped vehicle did not have a front license plate, the officers did

not see the temporary registration sticker until after the stop, and the lack of license plates or a

temporary registration would have constituted a violation of State law); United States v. Gaxiola,

149 Fed. Appx. 560, 561-62 (8th Cir. 2005)(failure to display front license plates justified traffic

stop). Even though the officer could not cite the exact code provision, CI Pierre testified that he

knew the Red Lake Tribal Code requires vehicles to be lawfully registered.  Further, CI Pierre

stated that the Defendant's license plate was covered with snow to the point where he could not

determine whether there was even a license plate on the car.  Thus, CI Pierre stated that he could

not determine whether the vehicle was lawfully registered and attempted to stop the Defendant's

vehicle for purposes of making this determination.  Furthermore, CI Pierre testified that he

believed the snow covering the license plate may also be a  violation of the Red Lake tribal code.

United States v. Fleetwood, 235 Fed.Appx. 892, 896 (3rd Cir. 2007) (finding that an actual

traffic violation need not occur, "but rather whether there are facts presented that would lead a

reasonable officer to believe that a violation may have occurred").  Here, under the facts of this

case, the Court finds it reasonable for an officer to conduct a limited Terry stop to determine

whether a vehicle was lawfully registered as required by tribal code where snow buildup prevented the officer from determining by observation whether a vehicle license plate was even present in the first place.  As such, the officers had reasonable, articulable suspicion to attempt to pull the Defendant's vehicle over.

In her memorandum supporting suppression, the Defendant asserts that naturally occurring events such as snow cannot form an objectively reasonable basis for a traffic stop.[3]  In support of this argument, the Defendant cites United States v. Edgerton, 438 F.3d 1043 (10th Cir. 2006).  In Edgerton, the Tenth Circuit held that reasonable, articulable suspicion did not exist for making a traffic stop of a vehicle where a temporary registration tag posted in the rear window could not be viewed by the officer because "it was dark out."  438 F.3d at 1051.  The Court noted that Kansas law requiring that license plates be clearly visible did not "require optimal viewing conditions" in order for compliance with the statute.  Id.  A contrary interpretation would mean that "snow, rain, fog, glare, or even an officer's poor eyesight might render a temporary registration illegible and in violation of the statute," and "[a]nyone driving under less than optimal viewing conditions in Kansas with an otherwise unremarkable temporary registration tag posted in the rear window would risk violating [the statute at issue]."  Id. at 1050.

However, the Court finds the reasoning in United States v. Fleetwood, 235 Fed.Appx. 892 (3rd Cir. 2007), more persuasive because unlike in Edgerton where the Court declined to find darkness to be a valid reason to pull over a vehicle, the court in Fleetwood dealt with the same issue here – a license plate obscured by snow.  Furthermore, the Court notes that Defendant has not pointed to any Eighth Circuit or any other  federal case where a court specifically found

---

[3] After the hearing on April 15, 2011, Defendant offered a certified copy of the weather report from Red Lake in support of her argument that it snowed on January 15.  (Docket No. 34).  The Court subsequently admitted the weather report into evidence as Ex. A.

that snow or even mud obscuring a license plate could not justify a traffic stop.  In Fleetwood,

the Court found that reasonable, articulable suspicion existed to pull over a vehicle when the first

letter of a license plate was obstructed by snow such that the officer reasonable believed it was a

violation of Pennsylvania law.  235 Fed.Appx. at 896-97.   Likewise, in the instant case, CI

Pierre testified that the Defendant's license plate was so obscured with snow to the point that it

was unclear whether the vehicle even had a license plate, and he was therefore unable to

determine whether the vehicle was properly registered as required by tribal code.[4]  For these

reasons, the Court recommends that the Defendant's motion to suppress on these grounds be

denied.[5]

## III.    SUPPRESSION OF STATEMENTS

### A.    Standard of Review

---

[4] The Defendant asserts that recent snow obscuring a license plate is not sufficient for a traffic stop because it gives unbridled discretion to police officer to stop any vehicle.   However, the Court does not say that merely having some snow obscuring a portion of the license plate will always be sufficient for a traffic stop, but rather that in this case where the snow made it impossible to tell whether there was even a license plate on the vehicle at all was sufficient to attempt a brief investigatory Terry stop to determine whether the vehicle was lawfully registered as required by tribal code.

[5] Although not argued by the Government, the Court notes that an additional justification existed for the traffic stop in this case.  Here, the officers had previously received information that White, for whom the officers had a warrant to arrest, was possibly riding around in a vehicle in Redby.  While parked at the fisheries, the officers saw a vehicle matching the description given to them regarding the vehicle allegedly containing White.  The officers knew from earlier investigations that this car belonged to the Defendant, whose boyfriend, Donald Leigh Clark, Jr. was also wanted as a fugitive in connection with a murder arising from the same incident for which White was wanted.  The connection the officers made between the vehicle information provided by the tip and their knowledge of the Defendant's relationship with one of the fugitives and her car from their prior investigative efforts validated the information they received from the tip.  Such information gave the officers a reasonable, articulable suspicion that White was possibly in the vehicle belonging to the Defendant.  Even though the officers could not definitely determine whether the car belonged to the Defendant, they had a reasonable suspicion that it was her car that drove by which also matched the description given to them by an informant.   As such, the officers had a "reasonable, articulable suspicion that criminal activity [was] afoot," Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (citing Terry, 392 U.S. at 30), and they were justified in stopping the Defendant so that they could investigate further.  On this basis, the officers lawfully pulled the Defendant over in an attempt to obtain more information.  United States v. Shields, 519 F.3d 836, 837 (8th Cir. 2008) (finding traffic stop valid where the officers received a tip that a fugitive was in the vehicle they pulled over even though he was not).  Additionally, the Court notes that Defendant's attempt to flee the officers when they first lawfully attempted to pull her over constituted a separate violation of tribal law giving rise to a separate basis for the officer to conduct an investigative stop of the Defendant.

"[Miranda] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way." Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444).

However, "police officers are not required to administer Miranda warnings to everyone whom they question." Oregon v. Mathiason, 429 U.S. 492, 495 (1977). "Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him in custody." Id. "After making an otherwise lawful Terry stop, an officer may conduct an investigation reasonably related in scope to the circumstances which justified the [stop] in the first place." United States v. Banks, 553 F.3d 1101, 1105 (8th Cir. 2009) (internal quotation marks omitted). Consequently, "most Terry stops do not trigger the detainee's Miranda rights." United States v. Pelayo-Ruelas, 345 F.3d 589, 592 (8th Cir. 2003). However, Terry stops sometimes "involve ... restraint [comparable to that associated with a formal arrest], necessitating Miranda warnings." United States v. Martinez, 462 F.3d 903, 909 (8th Cir. 2006).

To determine whether a roadside traffic stop amounts to a custodial interrogation requiring adherence to Miranda, courts ask whether the "traffic stop exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights." Berkemer v. McCarty, 468 U.S. 420, 437 (1984). "If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him in custody for practical purposes, he will be

entitled to the full panoply of protections prescribed by <u>Miranda</u>." <u>Id</u>. at 440.  "[T]he only

relevant inquiry is how a reasonable man in the suspect's position would have understood his

situation." <u>Id</u>. at 442.

In analyzing whether a person's freedom of movement has been restrained comparable to

a formal arrest, courts examine the circumstances surrounding the interrogation and ask whether

a reasonable person would have felt he or she was not at liberty to end the interrogation and

leave.  <u>Martinez</u>, 462 F.3d at 908-09.  The "ultimate inquiry is simply whether there [was] a

formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."

<u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983) (per curiam). "Two discrete inquiries are

essential to the determination: first, what were the circumstances surrounding the interrogation;

and second, given those circumstances, would a reasonable person have felt he or she was not at

liberty to terminate the interrogation and leave." <u>Thompson v. Keohane</u>, 516 U.S. 99, 112

(1995).  The analysis requires looking at the totality of the circumstances while keeping in mind

that the determination is based "on the objective circumstances of the interrogation, not on the

subjective views harbored by either the interrogating officers or the person being questioned."

<u>Stansbury v. California</u>, 511 U.S. 318, 322-23 (1994).

Factors which courts consider include "the duration of the stop, whether the suspect was

handcuffed or confined in a police car, whether the suspect was transported or isolated, and the

degree of fear and humiliation that the police conduct engenders." <u>United States v. Hill</u>, 91 F.3d

1064, 1070 (8th Cir. 1996).  Additionally, courts evaluate "whether the suspect was advised that

he was free to go, whether he was restrained, whether he initiated contact with the authorities,

whether strong arm tactics or deceptive stratagems were used, whether the atmosphere was

police dominated, and whether the suspect was placed under arrest at the termination of

questioning." United States v. Johnson, 64 F.3d 1120, 1126 (8th Cir. 1995) (citations and internal quotation marks omitted).

### B.    Discussion

Turning to the facts of the present case, the circumstances suggest that the Defendant was not in custody such that a Miranda warning was required.  When CI Pierre attempted to pull the Defendant over, she sped up and attempted to avoid the officer.  As soon as the officers pulled the Defendant over at the Clark residence, she got out of the car and attempted to run into the house.  CI Pierre then grabbed her by the wrist briefly in order to prevent her from fleeing again. At some point, handcuffs were briefly placedon the Defendant.  However, the testimony indicated that the handcuffs were removed by the time the Defendant was seated in the passenger seat of one of the police vehicles.  The mere fact that the Defendant was briefly placed in handcuffs does not mean that the encounter the equivalent to a formal arrest. See, United States v. Cervantes-Flores, 421 F.3d 825, 829-30 (9th Cir. 2005) (holding that Miranda warnings not required where officer used handcuffs to subdue defendant during Terry stop); United States v. Fornia-Castillo, 408 F.3d 52, 63-65 (1st Cir. 2005) (finding Miranda warnings not required where officer briefly drew pistol and subsequently placed defendant in handcuffs during Terry stop).

Still, the fact that the officers placed the Defendant into one of their vehicles suggests that she was not entirely free to leave.  Additional circumstances demonstrate, however, that there was not "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Beheler, 463 U.S. at 1125.  The officers told the Defendant that they were simply looking for White and Clark and asked her if she knew where they were.  Thus, the questions were not an attempt to incriminate the Defendant, but rather an attempt to obtain

information regarding a murder investigation and the location of other suspects for whom arrest warrants existed regarding the crime.  At no point did the officers' conduct suggest that the Plaintiff herself was under arrest.  In fact, the officers on other occasions had previously questioned the Defendant about the same issues without arresting her.  A reasonable person in her situation would have no reason to believe that this time would be different.  See United States v. Rutherford, 2007 WL 1514024 at *9 (E.D. Mo. May 21, 2007) (considering the fact that the Defendant had prior dealing with the officer which did not result in an arrest important to an inquiry into whether a Miranda warning was required).

Moreover, the officers did not use any "strong arm tactics or defensive stratagems" to extract responses.  Johnson, 64 F.3d at 1126.   In contrast, the Defendant readily answered the officer's question regarding where White and Clark were located without any sort of strong arm coercion on the part of the officers.  In fact, the Defendant even voluntarily offered to lead the officers to White's purported location.  This demonstrates that the atmosphere was not police dominated.  Id.  Additionally, the entire course of conduct was relatively brief because it only lasted 3-5 minutes and the Defendant was not physically isolated in any way.  See Hill, 91 F.3d at 1070.  Rather, the Defendant was in public in the driveway of her boyfriend's father's home.  Thus, the totality of the circumstances show that the Defendant was not faced with the equivalent of a formal arrest.  Therefore, the officer did not have to administer a Miranda warning since she was not then in custody.  On this basis, the Court recommends that the Defendant's motion to suppress be denied as to the Miranda issue.

## IV.    SEARCH OF DEFENDANT'S VEHICLE

### A.    Standard of Review

"Searches conducted without a warrant are per se unreasonable subject to a few well established exceptions."  Hill, 386 F.3d at 858.  The "plain view" doctrine constitutes one such exception.  The "plain view" doctrine   permits the lawful seizure of incriminating evidence that is in the "plain view" of the searching officers.  The doctrine allows police officers to seize evidence without a warrant when (1) "the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed," (2) the object's incriminating character is immediately apparent, and (3) the officer has "a lawful right of access to the object itself." United States v. Hughes, 940 F.2d 1125, 1126-27 (8th Cir. 1991)(quoting Horton v. California, 496 U.S. 128, 136-37 (1990)).  "The immediately apparent requirement means that officers must have probable cause to associate the property with criminal activity." United States v. Hatten, 68 F.3d 257, 261 (8th Cir. 1995) (internal citations and quotations omitted).

The Eighth Circuit has held that "[t]he act of looking through a car window is not a search for Fourth Amendment purposes because a person who parks a car-which necessarily has transparent windows-on private property does not have a reasonable expectation of privacy in the visible interior of [her] car." United States v. Bynum, 508 F.3d 1134, 1137 (8th Cir. 2007); see also United States v. Gillon, 348 F.3d 755, 759-60 (8th Cir. 2003).  The rule applies even when occupants have exited their vehicles at the time that the officers looked through the windows.  Id. "All that is required is that at the time the officers observed the [contraband] in the car, they must have had a right to be in close proximity to the car at a point from which the observation occurred."  Hatten, 68 F.3d at 260.  "[A] truly cursory inspection-one that involves merely looking at what is already exposed to view is not a "search" for Fourth Amendment

purposes, and therefore does not even require reasonable suspicion." United States v. Brown, 2009 WL 2982934 at *10 (D. Minn. Sept. 14, 2009) (citing Hatten, 68 F.3d 257 at 261).

**B.      Discussion**

In the instant case, the officers were lawfully near the Defendant's vehicle because, as discussed above, they were justified in pulling the Defendant over to conduct a limited traffic stop under Tery v. Ohio.   While near the vehicle, CI Pierre shined a flashlight in the vehicle when he noticed the shape of a person wrapped in a blanket.  Using a flashlight does not negate the plain view doctrine.  Hatten, 68 F.3d 257 at 261 ("It does not matter that Officer Pfeffer used a flashlight").  Here, a number of facts gave the officers probable cause to search the vehicle. First, CI Pierre saw someone in plain view.  Second, the officers had earlier received a tip that a fugitive was riding in a vehicle with a description that matched the Defendant's vehicle.  Third, the person in the backseat was wrapped in a blanket and apparently attempting to hide.  "[G]iven the totality of the circumstances, a reasonable person could believe there is a fair probability" that Clark or White would be found in the vehicle.  United States v. Fladten, 230 F.3d 1083, 1085 (8th Cir. 2000).[6]  As such, probable cause existed justifying the search.  The Court recommends that the Defendant's motion to suppress here also be denied.

**V.      CONCLUSION**

1.              Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress

Confessions or Statements [Docket No. 22] be **DENIED** in its entirety.

---

[6] In addition, the Court notes that the Defendant arguably consented to the search of her vehicle.  When CI Pierre first made contact with the Defendant at the Clark residence, he asked Defendant if there was anyone in her car.  CI Pierre further testified that the Defendant stated that no one was in her car and that he could look inside the vehicle if he wanted.  Additionally, the Defendant gave CI Pierre the keys to her vehicle.  Even if, as the Defendant asserted at the suppression hearing, Defendant gave the officers her keys with the expectation they would only give the keys to David Leigh Clark, Sr.'s wife for safekeeping, CI Pierre testified that the officers would have still looked in the vehicle before transferring custody to the David Leigh Clark, Sr.'s wife.

Dated: May 9, 2011                                    s/Leo I. Brisbois
                                                     LEO I. BRISBOIS
                                                     United States Magistrate Judge

**N O T I C E**

Pursuant to Local Rule 72.2(b), any party may object to this Report and

Recommendation by filing with the Clerk of Court, and serving all parties **by May 23, 2011**, a

writing that specifically identifies the portions of the Report to which objections are made and

the bases for each objection. A party may respond to the objections within fourteen days of

service thereof.  Written submissions by any party shall comply with the applicable word

limitations provided for in the Local Rules.  Failure to comply with this procedure may operate

as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  This Report

and Recommendation does not constitute an order or judgment from the District Court, and it is

therefore not directly appealable to the Court of Appeals.